IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED
99 JUL 27 AM 9:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| BRUCE VINSON, | ) |
| Plaintiff, | ) |
| vs. | ) No. CV 98-J-0432-S |
| THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ALABAMA, | ) |
| Defendant. | ) |

ENTERED
JUL 27 1999

## MEMORANDUM OPINION

This cause comes before this Court on Defendant's motion for summary judgment (doc. 10).

### Undisputed Material Facts

Plaintiff is a certified radiology technologist who at all times relevant to this action was employed in the radiology department of University hospital. University hospital is operated by the University of Alabama in Birmingham ("UAB"). While working at UAB, Plaintiff also worked as a radiology technologist at the Veterans' Administration hospital ("VA") in Birmingham, Alabama. In both of these positions, Plaintiff worked primarily as a general diagnostic radiology technologist.[1] While

---

[1] The general diagnostic area of radiology involves taking two-dimensional x-ray images. In addition to the general diagnostic area, radiology technologists may specialize in areas such as CT scanning, MRIs, nuclear medicine, and ultrasound.

1

18

working as in the general diagnostic area, Plaintiff used some of his own time to cross train in the CT area of specialization. Plaintiff accrued approximately 300 hours of cross training in this manner during between March 1992 and August 1995. A CT technologist ("CT technologist") is a specialized radiology technologist who works with three dimensional imaging systems. Plaintiff wanted to become a CT technologist and seized an opportunity to cross train more intensively at UAB from August through November 1995. Plaintiff understood this cross training to be a pre-requisite for a full transfer to the CT section to fill the CT technologist position vacated by Bill Hughes. (Vinson depo. at 37-39.)

During his 1995 cross-training, Plaintiff was under the impression that he was being trained to fill an empty position in UAB's CT section of the radiology department.[2] Defendant counters that this was never the intention. (*See* Declaration of Dell Pickett at ¶¶ 2, 5.) At the time of Defendant's 1995 cross-training, UAB was being evaluated by West Hudson, a consulting firm, in an effort to determine ways the facility could operate more efficiently. In or about November 1995, Plaintiff was returned to his position in the general diagnostic section. Plaintiff contends that supervisory personnel told him at that time that the CT position for which he was cross training had been slated for elimination

---

[2] UAB has one radiology department divided into various sections including, but not limited to, CT, ultrasound, MRI, and x-ray. Prior to January 27, 1997, all UAB radiology technologists were on the same pay grade except those working in the nuclear medicine and ultrasound sections. (Billingsley depo. at 49.)

by the West Hudson study. Defendant contends that it anticipated West Hudson would recommend cutting a CT position, but Defendant was unsure in November 1995 which CT position would be targeted. In any event, Plaintiff was returned to his former position as in the general diagnostic section.

Upon said return, Plaintiff was informed by his shift supervisor that he would no longer be working as a weekend supervisor as he had before he began cross training in CT. Plaintiff contends that he had been told by the Dell Pickett, the radiology supervisor,[3] that he could return to his former position with all privileges intact. Thus, Plaintiff was upset when he was informed that he would no longer be a weekend supervisor. The weekend supervisor's position did not include any additional pay. However, Plaintiff contends that the weekend supervisor's position could serve as a stepping stone to a shift supervisor's position which would entail a pay raise.

In or about November 1995, Dell Pickett left his employment as Technical Director of Radiology at University Hospital. Upon Pickett's separation from the hospital, the supervisory responsibilities of the radiology department were reorganized. Mr. J.D. Billingsley, former head of the nuclear medicine section of the radiology department, assumed Pickett's former responsibilities in addition to others.

---

[3] Mr. Dell Pickett was the Technical Director of Radiology at University Hospital prior to November 1995. (*See* Dec. of Dale Pickett at ¶1.) It is not clear from the record what official position, if any, Pickett held on the day Plaintiff's cross training ended. However, it is clear that Plaintiff understood Pickett to be speaking with supervisory authority over Plaintiff.

During Plaintiff's 1995 cross training, Ms. Dena Hendrix was working as a full-time, temporary CT technologist filling the responsibilities vacated by Bill Hughes. Hendrix was qualified to work independently of supervision because she had four to five years experience as a CT technologist. (*See* Declaration of Dell Pickett at ¶ 3; Billingsley depo. at 71-72; Vinson depo. at 49-50.) Within a few months after Plaintiff's return to the general diagnostic section, Hendrix was made a full-time permanent employee filling the same position for which she had been a temporary employee.

In or about March 1996, the CT section had one technologist retiring and one beginning medical leave. (Billingsley depo. at 118.) Thus, Billingsley found it necessary to hire a CT technologist who could begin working independently with little or no training. At that time Karla Isbell was a certified radiological technologist working at University Hospital. (Declaration of J.D. Billingsley at ¶ 1; Billingsley depo. at 76.) At said time, Isbell had ten months prior experience as a CT technologist at Medical Center East. (Billingsley depo. at 76.) Without advertising the opening, Billingsley placed Isbell in the position. Several radiology technologists, including Plaintiff, complained to Billingsley about his decision to place Isbell in the position without posting it. Plaintiff informed Billingsley that he wanted to be considered for future openings in the CT section.

In or about December 1996, Tawana Franklin resigned as a CT technologist at University Hospital. (Billingsley depo. at 84.) Billingsley posted said opening, and

4

Plaintiff applied. After interviewing several candidates, Billingsley promoted Wendy Reinert, a radiology technologist trainee who had been working in the CT section for twelve to fifteen months. (*Id.* at 86, 91-92.) At the time Reinert was promoted, she was not certified by The American Registry of Radiological Technologists. (Declaration of J.D. Billingsley at ¶ 2.) However, there was no job requirement that Reinert be certified a the time of hire. (*Ibid.*) Rather, she need only become certified within six months of hire, which she did. (*Ibid.*)

In January 1997, some jobs within the radiology department were reclassified so as to set them at a higher pay grade. (Billingsley depo. at 49.) At that time, the CT technician's positions were moved to a pay grade higher than that of a general radiology technologist. (*Ibid.*) However, some radiology technologists continued to make more money that some CT technologists due to the number of years they had been employed by UAB. (*Ibid.*)

On April 23, 1998, the radiology department posted an announcement for a program whereby four regular radiology technologists could cross train for approximately one year and become competent in the CT area. (*Id.,* ex. 14.) Upon completion of the cross training and necessary evaluations by supervisors, the selected individuals would receive the title of CT technologist and the commensurate pay step increase. (*Id.* at 102.) The requirements for admission to this cross training program included requirements that the employee was not "on imposed probation" and had not received "disciplinary action

5

... during the 90-day period preceding the selection process." (*Id.*, ex. 14 at ¶¶ 2, 4.) From January 21, 1998 through April 23, 1998, Plaintiff was on imposed probation due to excessive absences. (Vinson depo., ex. 25.) Thus he was ineligible for this cross training program.

On April 4, 1999, Plaintiff terminated his employment with UAB to take a position with a VA hospital in Florida. (Vinson depo. at 9.)

## Summary judgment standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp.* 477 U.S. at 322-23. The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying

6

those portions of the pleadings or filings which it believes demonstrates the absence of a genuine issues of material fact. *Id.* at 323. The burden then shifts to the nonmoving party to "go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, Fed. R. Civ. P. 56(e). In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 587, *see also Anderson*, 477 U.S. at 249. The non-movant must "demonstrate that there is indeed a material issue of fact precluding summary judgment." *Clark v. Clark & Coats, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

On motions for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. See *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at

248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249. The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Holcombe v. Alabama Dry Dock & Shipbuilding*, 1998 WL 758012 (S.D. Ala.); citing *Anderson*, 47 U.S. at 251-252.

## Analysis

Plaintiff contends that he was denied three promotions based on his gender in violation of Title VII. The disputed positions were awarded to Dena Hendrix, Karla Isbell, and Wendy Reinert. In order to prove that Title VII was violated in the instant case, Plaintiff must prove that (1) he is a member of a protected class; (2) he was qualified for and applied for the promotion [4]; (3) he was rejected in spite of his

---

[4] The parties dispute regarding whether a move to the CT section would have constituted a promotion for Plaintiff at the times in question. It is undisputed that all of the hiring decisions in question were made prior to January 27, 1997, while "all technologist positions [in the radiology department] with the exception of nuclear medicine technologists and ultrasound technologists were" on the same pay grade. (Billingsley depo. at 49.) Thus, Plaintiff would not have received an immediate pay increase *even if he had been awarded one of the three disputed positions*. However, it is also undisputed that, in mid-1996, Billingsley began trying to get a pay increase for some specialized radiology technologists including those in the CT section. (*Id.* at 47.) Plaintiff claims to have heard about the potential for higher pay. Had Plaintiff received one of the disputed positions and remained in the employ of UAB until January 27, 1997, he would have received the pay raise. Additionally, there is evidence that specialized positions are considered more desirable by some radiology technologists.

This court withholds ruling on whether the disputed CT positions would have constituted a promotion for Plaintiff because Defendant's motion is due to be granted *even if the positions were considered promotions for Plaintiff.* For purposes of this opinion, the court will treat the disputed positions as if they would have constituted promotions for Plaintiff.

8

qualifications; and (4) Defendant continued to seek applicants for the position or filled the position with a person outside the protected class. *Walker v. Mortham*, 158 F.3d 1177, 1191-1193 (11th Cir. 1998) (citing *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S. Ct. 2363 (1989)). As a male, Plaintiff is a member of a protected class. He applied for the positions filled by Hendrix and Reinert. (Billingsley depo., ex. 10, 13.) There is evidence that he would have applied for Isbell's position had it been posted.[5] For purposes of this analysis, the court will treat the Isbell position as if Plaintiff had applied for it. Plaintiff was rejected for each of the disputed positions. Ultimately, each of the positions was awarded to a female. Thus, Plaintiff's *prima facie* case turns on whether or not he was qualified for the positions for which he applied.

It is undisputed that Plaintiff cross trained in Defendant's CT section between August and November of 1995. In addition, Plaintiff contends that he had done some 300 hours of CT cross training on his own time prior to August 1995. Thus, Plaintiff had approximately twenty work weeks of CT cross training as of November 1995. Plaintiff contends that he was "just about at the point where [he] could have been let go" to

---

[5] Billingsley believed that he could transfer individuals within the radiology department without advertising the position. Thus, he did not advertise the CT position he filled with Isbell. Billingsley should have advertised the opening pursuant UAB's Personnel Policies and Procedures manual §111.A dated March 1993. While this was an error by Billingsley, it does not constitute a Title VII violation in and of itself.

There is evidence that Plaintiff would have applied for Isbell's position if it had been posted. After Isbell's appointment, Plaintiff approached Billingsley to express his dissatisfaction at being denied an opportunity to apply for the position. Thus, the court will treat the Isbell position as if Plaintiff had applied for it for purposes of this analysis.

operate as an independent CT technologist in November 1995. (Vinson depo. at 44.) Defendant counters that it takes at least six months to one year for a radiology technologist to become proficient in CT via on the job training. Thus, there is a genuine issue of material fact regarding Plaintiff's qualifications for the three positions. Plaintiff succeeds in establishing his *prima facie* case.

In response to Plaintiff's *prima facie* case, Defendant offers legitimate, non-discriminatory reasons for hiring each of the women rather than Plaintiff. In each case, Defendant contends that the individual hired was more qualified than Plaintiff. Plaintiff does not dispute that Hendrix is a more qualified CT technologist than he is. (Vinson depo. at 49-50.) However, Plaintiff disputes the qualifications of Isbell and Reinert. In his deposition, Plaintiff testified that he thought Isbell was an un-certified, student trainee prior to her assignment to the CT section. (*Id.* at 81.) However, upon further questioning, he admitted "I don't really know what her qualifications are." (*Ibid.*) In his brief, he concedes that she was a radiology technologist at UAB prior to her placement in the CT section. (Plaintiff's brief at 6.) Defendant has provided evidence that Isbell was in fact certified as a radiology technologist by The American Registry of Radiological Technologists and had ten months of CT experience at the time she was awarded the job of CT technologist. (Declaration of J.D. Billingsley at ¶ 1; Billingsley depo. at 76.) In addition, Billingsley testified that Isbell was placed in her position as a CT technologist at a time that one CT technologist was retiring and another was beginning medical leave.

(Billingsley depo. at 76-77.) Thus, he needed someone who could work independently with minimal training.[6] Isbell fit these criteria and was already working in UAB's radiology department. With her ten months of experience, Isbell was more qualified to begin working independently than was Plaintiff.

Finally, Defendant contends that Reinert was also more qualified than Plaintiff. Defendant admits that Reinert was a student hired from UAB's Radiological Trainee program prior to receiving her certification from The American Registry of Radiological Technologists. (Declaration of J.D. Billingsley at ¶ 2.) However, Reinert received her certification within six months of employment thereby meeting the employment criteria. (*Ibid.*) Defendant contends that Reinert was the most qualified individual for the December 1996 CT technologist position because she had spent twelve to fifteen months as a student trainee in Defendant's CT section. (Billingsley depo. at 86-91.) By the time she finished her trainee program, she had "been actively preforming CT scans ... in the UAB CT section for at least 12 to 15 months...." (*Id.* at 86-87.) In addition, Reinert had received recommendations from the CT technologists with whom she worked. (*Id.* at 89.)

---

[6] Plaintiff argues that Isbell was not familiar with the CT section at UAB where the procedures are more advanced than at other area hospitals. (Billingsley depo. at 77-78.) Defendant does not deny that Isbell requried some minimal training in UAB's specific CT procedures. (*Ibid.*) In response, Plaintiff offers no evidence that he was more qualified in UAB's CT procedures. Rather, he argues that he woas more experienced with emergency situations that Isbell. (Plaintiff's brief at 7.) This is not enough to raise an issue of material fact regarding the comparative qualfications of Plaintiff and Isbell as CT technologists. Plaintiff offers no evidence that he was more capable of performing CT scans than Isbell was in March 1996.

11

Defendant contends Reinert's qualifications were of critical importance in December 1996 because the hospital was losing another CT technologist, Tawana Franklin. (*Id.* at 84, 87.) Thus, Defendant needed someone to replace Franklin who could begin working independently almost immediately. With her twelve to fifteen months of experience, Isbell was more qualified to begin working independently than was Plaintiff.

Defendant has offered legitimate, non-discriminatory reasons for its hiring decisions. In order to survive Defendant's motion for summary judgment, Plaintiff must offer evidence that said reasons are a pretext for discrimination. To that end, Plaintiff offers one hearsay statement by a CT escort named Dwight. Plaintiff testified that Dwight "stated the fact that he had overheard the women talking and stated that I didn't necessarily fit their criteria of what they wanted back in their CT department ... that I was a male with long hair, and they didn't necessarily like that." (Vinson depo. at 56-57.) No evidence is presented regarding the identity of the female CT technologists who allegedly made this statement.[7] Hearsay testimony is inadmissable as evidence and cannot be used to oppose a motion for summary judgment. *See Benson v. Vermont American Corp.*, 723 F. Supp. 1439 (M.D. Ala.1988) ("inadmissible evidence offered in the form of a

---

[7] Plaintiff makes the bald assertion that the same CT technologists who made the alleged comments had supervised Wendy Reinert and later recommended her for her disputed position. Plaintiff alleges the statement was made by unidentified female CT technologists. Reinert's recommendations came form Kathy Blackston and Ann Andrews. (Billingsley depo. at 89.) There were other female CT technologists besides Blackston and Andrews, and Plaintiff offers no evidence that Blackston or Andrews made the alleged comments.

12

deposition, cannot be considered by the court"), aff'd without opinion, 874 F.2d 820 (11th Cir.1989).[8]

In his brief, Plaintiff relies on speculation, innuendo, and the alleged demographic statistics of the CT section in an effort to demonstrate pretext. "Even if these [demographic statistics] ... are true, they are of no probative value whatsoever without the proper statistical foundation. In order for these statistics to be probative, plaintiff would have to provide *comparative* statistics that showed the success rates of similarly qualified [male and female] ... applicants." *Allen v. City of Athens*, 937 F. Supp. 1531, 1546 (N.D. Ala. 1996) (citing *Howard v. BP Oil Co.*, 32 F.3d 520, 524 (11th Cir. 1994) (emphasis original). Without admissible evidence that Defendant's legitimate reasons are pretexts for discrimination, Plaintiff cannot survive Defendant's motion for summary judgment.

## Conclusion

No genuine issues of material fact remain. Defendant's motion for summary judgment (doc. 10) is due to be granted.

It is therefore **ORDERED** that Defendant's motion for summary judgment (doc.

---

[8] Even assuming the statement by Dwight were admissible, no evidence is offered to connect said statement to Dell Pickett, Neil Blue, J.D. Billingsley, Donna Powers or Dena Hendrix. The three men were the three radiology department supervisors with the authority to hire, transfer, and/or promote radiology technologists during the times relevant to this lawsuit. Powers and Hendrix were CT section supervisors during the relevant times. The Eleventh Circuit has held that when there is no factual evidence linking the alleged speaker of a discriminatory statement to the decision-making process "[the] statement is too attenuated to present a genuine issue of material fact as to [Defendant's ] ... discriminatory intent." *Mauter v. Hardy Corp.*, 825 F.2d 1554 (11th Cir. 1987).

10) be and hereby is **GRANTED** in accordance with the separate order this day entered.

**DONE and ORDERED** this the 26 day of July, 1999.

*[signature]*
Inge P. Johnson
United States District Judge